NO. 23-10070-AA

_____

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

_____

ONEMATA CORPORATION,

*Plaintiff-Appellee*, v.

ASHFAQ RAHMAN and SABIRA AREFIN,

*Defendant-Appellants, v.*

WILLIAM SMITH and ENSCICON ACQUISITIONS II, LLC,

*Third-Party Defendants-Appellants.*

Appeal from the United States District Court
for the Southern District of Florida

No. 1:20-cv-62002-WPD

_____

## ASHFAQ RAHMAN'S INITIAL BRIEF

_____

**MAVRICK LAW FIRM**
Peter T. Mavrick
Jacob M. Resnick
1620 West Oakland Park Boulevard
Suite 300
Fort Lauderdale, Florida 33311
(954) 564-2246
*Attorneys for Appellant*
*Ashfaq Rahman*

No. 23-10070-A
**ONEMATA CORPORATION v. ASHFAQ RAHMAN ET AL.**

**Certificate of Interested Persons and
Corporate Disclosure Statement**

Undersigned counsel certifies that the following persons may have an interest in the outcome of this case:

**A.      Certificate of Interested Persons (CIP)**

- Arefin, Sabira
- Betesh, Gal
- Dimitrouleas, William
- Enscicon Acquisition, LLC
- Enscicon Acquisition II, LLC
- Enscicon Corporation
- Leffert, Anthony
- LocalBlox, Inc.
- Lowell, Karen
- Mavrick, Peter T.
- Minerly, Fein, P.A.
- Minerly, Kenneth
- Onemata Corporation
- Pence-Aviles, James
- Peter T. Mavrick, P.A.
- Rahman, Ashfaq
- Robinson Waters & O'Dorsio, P.C.

- Resnick, Jacob M.

- Snow, Lurana S.

- William, Smith

- Winderman, Harry

No publicly traded company or corporation has an interest in the outcome of this appeal.

**B.    Corporate Disclosure Statement**:

Nothing to declare.

**GLOSSARY**

| | |
|---|---|
| Acton | LocalBlox data vendor Acton International Ltd. Acton is not a party in the lawsuit. |
| Arefin: | Defendant Appellant, Sabira Arefin. |
| D.E.: | Docket entries filed with the clerk of court for the United States District Court for the Southern District of Florida in this lawsuit.<br><br>All record citations in this brief will be made to the docket entries filed in this lawsuit with the clerk of court for the United States District Court for the Southern District of Florida unless otherwise noted herein. |
| D.E. App.: | Docket entries filed with the clerk of court for the United States Court of Appeals for the Eleventh Circuit. |
| Enscicon | Onemata's predecessor in interest, Enscicon Acquisitions, LLC. |
| Enscicon II | Third-Party Defendants and Appellee, Enscicon Acquisitions II, LLC. |
| Final Judgment: | The district court's Amended Judgment filed at D.E. 368. |
| LocalBlox: | LocalBlox Inc. |
| JMOL | Renewed Motion for Judgment as a Matter of Law, Motion for New Trial, Motion to Amend Final Judgment, and Motion for Remittitur filed at D.E. 393. |
| Onemata: | Plaintiff Appellee Onemata Corporation. |
| Order: | The district court's Order Denying Defendants' Renewed Motions for Judgment as a Matter of Law, for New Trial, to Amend Final Judgment, and for Remittitur entered at D.E. 440. |

| Purchase Agreement: | The Stock Purchase Agreement entered between Enscicon, Rahman, and Arefin on December 19, 2019. The Purchase Agreement was entered into evidence during trial and filed at D.E. 373-2. |
|---|---|
| Rahman: | Defendant Appellant, Ashfaq Rahman. |
| Smith: | Third-Party Defendant and Appellee, William Smith. Smith is the owner and CEO of Onemata. |
| TrueInfluence | LocalBlox customer TrueInfluence LLC. TrueInfluence is not a party in the lawsuit. |
| X-Mode | LocalBlox data vendor X-Mode Social Inc. X-Mode is not a party in the lawsuit. |

## STATEMENT REGARDING ORAL ARGUMENT

Appellant Ashfaq Rahman respectfully requests oral argument. Oral argument will supplement the parties' written submissions and help this Court resolve the issues on appeal because the trial involved a complex fact pattern giving rise to numerous appellate issues. Oral argument will enable the Court and the parties to distill the issues into simpler form and will help guide the Court's attention to key issues.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

GLOSSARY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

STATEMENT REGARDING ORAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . v

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

TABLE OF AUTHORITIES  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ix

STATEMENT OF SUBJECT-MATTER AND APPELLATE JURISDICTION . .1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW . . . . . . . . . . . . . 3

STATEMENT OF THE CASE AND FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . 4

SUMMARY OF THE ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

STANDARDS OF REVIEW  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    **A. The standard of review for denying Rahman's Renewed Judgment as a Matter of Law and for New Trial under Rule 50 is** *de novo* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    **B. The standard of review for denying Rahman's Motion for New Trial, to Amend Judgment, and to Remit the Verdict under Rule 59 is abuse of discretion**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    **C. The standard of review for determining whether the district court erred in excluding Dr. Cole's full rebuttal opinion and allowing a general verdict form was abuse of discretion** . . . . . . . 22

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    **A. Onemata's torturous interference claim was not supported by competent trial evidence because Onemata did not (1) possess a contractual or business relationship with TrueInfluence and (2) establish damages resulting from Rahman's alleged tortious interference** . . . . . . . . . . . . . . . . . . . . . ... . . . . . . . . . . . . . . . . . . . . . . . 23

        **1. Onemata failed to prove it had a contractual relationship or business relationship with TrueInfluence.** . . . . . . . . . . . . . . . . . . . 23

**2.   Onemata failed to prove it was damaged as a result of Rahman's tortious interference with its alleged relationship with TrueInfluence** …….…………………………………………… 26

**B. No reasonable jury could return a $5 million dollar verdict in favor of Onemata on its breach of contract claims because the trial evidence is legally insufficient to support that verdict**. . . . 29

**1. Seigneur could not predicate his Valuation on LocalBlox's distribution of X-Mode data to Prohibited Customers because Onemata failed to prove the distribution occurred between February 12, 2019 and December 18, 2019** …………………….. 31

**2.   Customer server misuse is not a valid basis for Seigneur's Valuation because no evidence demonstrated that Rahman caused LocalBlox to misuse customer servers on or before the Purchase Date** …………………………………………………34

**3.  Unpaid sales tax is not a basis to value LocalBlox** . . . . . . . .39

**4.  Onemata cannot disassociate from the foundational elements of Seigneur's Valuation** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

**5.   The jury could not rely on evidence outside Seigneur's Valuation to determine damages** ………………………………44

**6.  The district court abused its discretion by allowing the jury to use a general verdict form** …………………………………..46

**C. The verdict amount should be remitted to $657,215.88**. . . . . . . 48

**D. The $5 million verdict should alternatively be remitted to $2,235,093 at most**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .51

**E. The district court abused its discretion in disallowing Dr. Cole to present his entire rebuttal opinion**. . . . . . . . . . . . . . . . . . . . . .. 54

**1. Dr. Cole analyzed LocalBlox Production Code to disprove O'Day's opinions regarding LocalBlox's use of TrueInfluence's API key** ……………………………………………………………54

**2. Dr. Cole analyzed the Production Code to disprove O'Day's opinions regarding LocalBlox's purported manipulation of X-Mode data** ……..……………………………………………55

**3. Excluding Dr. Cole's full rebuttal opinion was an abuse of discretion, substantially affected Rahman's rights, and was harmful error** …………………….…………….………………56

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

CERTIFICATE OF COMPLIANCE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

# TABLE OF AUTHORITIES

## Cases

Page(s)

*Ahern v. Boeing Co.*,
  701 F.2d 142, 144 (11th Cir. 1983) ……..…………………………………23

*Air Caledonie Intern. v. AAR Parts Trading, Inc.*,
  315 F. Supp. 2d 1319, 1337 (S.D. Fla. 2004) …..………………………… 51

*Allapattah Services, Inc. v. Exxon Corp.*,
  61 F. Supp. 2d 1326, 1328 (S.D. Fla. 1999) …...………………….………51

*Alphamed Pharm. Corp. v. Arriva Pharm., Inc.*,
  432 F. Supp. 2d 1319, 1352 (S.D. Fla. 2006) .…………………………26, 28

*Am. Builders Ins. Co. v. S.-Owners Ins. Co.*,
  56 F.4th 938, 944 (11th Cir. 2023) ……..…………………………………21

*Am. Transp., Inc. v. Richard Sewing Mach. Co.*,
  172 F.3d 781, 784 (11th Cir. 1999) ……..…………………………………42

*Bianchi v. Roadway Express, Inc.*,
  441 F.3d 1278, 1282 (11th Cir. 2006) …...…………………………………20

*Bischoff v. Osceola County, Fla.*,
  222 F.3d 874, 878 (11th Cir. 2000) …………..……………………………44

*Bonner v. City of Prichard*,
  661 F.2d 1206, 1209 (11th Cir.1981) …………..…………………………21

*Bonura v. Sea Land Serv., Inc.*,
  505 F.2d 665, 669 (5th Cir. 1974) …..………..…………………………21

*Brough v. Imperial Sterling Ltd.*,
  297 F.3d 1172, 1177 (11th Cir. 2002) ..………...…………………………27

*Burger King Corp. v. Berry*,
  2019 WL 571483, at *2 (S.D. Fla. Jan. 8, 2019) ..…………………………54

ix

*Christiansen v. Wright Med. Tech., Inc.*,
    851 F.3d 1203, 1213 (11th Cir. 2017) …..………………………………22

*Cioffe v. Morris,*
    676 F.2d 539, 541 (11th Cir. 1982) …………..…………………………39

*City of Tuscaloosa v. Harcros Chemicals, Inc.*,
    158 F.3d 548, 556 (11th Cir. 1998) ……..………………………………22

*Ctr. Chem. Co. v. Avril, Inc.*,
    392 F.2d 289, 290 (5th Cir. 1968) …………....…………………..27, 28

*Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579, 580 (1993) ……………….………………………………29

*Freedman v. magicJack Vocaltec Ltd.,*
      963 F.3d 1125, 1133 (11th Cir. 2020) …...……………..………… 45

*Gorsalitz v. Olin Mathieson Chemical Corp.,*
    429 F.2d 1033, 1047 (5th Cir. 1970) ………..….…………………………49

*Guice v. Postmaster Gen., U.S. Postal Serv.*,
    718 Fed. Appx. 792, 797 (11th Cir. 2017) …...……………………………21

*Hewitt v. B.F. Goodrich Co.,*
    732 F.2d 1554, 1559 (11th Cir. 1984) ………..….………………………48

*Iden v. Kasden,*
    609 So. 2d 54, 57 (Fla. 3d DCA 1992) ……..…………………………29, 42

*Imperial Majesty Cruise Line, LLC v. Weitnauer Duty Free, Inc.,*
    987 So. 2d 706, 708 (Fla. 4th DCA 2008) .....………………………26, 28

***ISS Cleaning Services Group, Inc. v. Cosby,***
    745 So. 2d 460, 462 (Fla. 4th DCA 1999) …………………………24, 25

*Johansen v. Combustion Eng'g, Inc.,*
    170 F.3d 1320, 1328 (11th Cir. 1999) ………..….………………………48

*Jones v. Otis Elevator Co.*,
    861 F.2d 655, 661 (11th Cir. 1988) …………..…………………………34

*Keyes v. Lauga*,
    635 F.2d 330 (5th Cir. 1981) …………….…...……………………………49

*Lake Gateway Motor Inn, Inc. v. Matt's Sunshine Gift Shops, Inc.*,
    361 So. 2d 769, 772 (Fla. 4th DCA 1978) ……..……………………………26

*Lipphardt v. Durango Steakhouse of Brandon, Inc.*,
    267 F.3d 1183, 1186 (11th Cir. 2001) …..…………………………………20

*Lowe v. General Motors Corp.*,
    624 F.2d 1373, 1383 (5th Cir. 1980) ………....………………………………49

*Messer v. E.F. Hutton & Co.*,
    833 F.2d 909, 923 (11th Cir. 1987) …………..……………………………43

*McGinnis v. Am. Home Mortg. Serv., Inc.*,
    817 F.3d 1241, 1255 (11th Cir. 2016) ..………………………………20, 21

*Nat'l Fire Ins. Co. of Hartford v. Fortune Constr. Co.*,
    320 F.3d 1260, 1267-68 (11th Cir. 2003) …..………………………………20

****Ohio State Troopers Ass'n, Inc. v. Point Blank Enterprises, Inc.,****
    2020 WL 1666763, at *9 (S.D. Fla. Apr. 3, 2020) …………………………54

*Papasan v. Dometic Corp.*,
    2019 WL 7376716, at *3 (S.D. Fla. Apr. 10, 2019) ………………………54

*Pitney Bowes, Inc. v. Mestre*,
    701 F.2d 1365, 1368 (11th Cir. 1983) ……………………………………… 2

*Quality Foods, Inc. v. U.S. Fire Ins. Co.*,
    715 F.2d 539, 542 (11th Cir. 1983) …………….…...………………………48

****Ralston Purina Co. v. Hobson,****
    554 F.2d 725, 728-29 (5th Cir. 1977) …………..……………………29, 30

*Ramjeawan v. Bank of America Corp.,*
  2010 WL 18882262, at *2 (S.D. Fla. May 11, 2010) ………………………40

*Realauction.com, LLC v. Grant St. Group, Inc.,*
  82 So. 3d 1056, 1060 (Fla. 4th DCA 2011) …………………………………26

*Sabey v. Howard Johnson & Co.,*
  5 P.3d 730, 735 (Wash. Ct. App. 2000) ………...……………………...……..45

*Simon v. E. Kentucky Welfare Rights Org.,*
  426 U.S. 26, 38 (1976) …………………………..…………………………44

*Thomas v. Farmville Mfg. Co., Inc.,*
  705 F.2d 1307, 1307 (11th Cir. 1983) …………...………………………21

*Thosteson v. United States,*
  304 F.3d 1312, 1316 (11th Cir. 2002) …....……………………………20

*Underwriters at Interest v. All Logistics Group, Inc.,*
  483 F. Supp. 3d 1199, 1205 (S.D. Fla. 2020) …....………………………42

*United States v. 0.161 Acres of Land,*
  837 F.2d 1036, 1040 (11th Cir. 1988) …………...………………………29

*United States v. Brown,*
  415 F.3d 1257, 1266 (11th Cir. 2005) …………...………………………56

*Warth v. Seldin,*
  422 U.S. 490, 498–99 (1975) ………………….....………………………44

****Yoder Bros., Inc. v. California-Florida Plant Corp.,****
  537 F.2d 1357, 1371 (5th Cir. 1976)………..……………… ………… 29, 30

## Statutes

Page(s)

28 U.S.C. § 1291. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1332 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Fla. Stat. § 768.74. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ... . . . . . . . . . 48

## Rules

Page(s)

Federal Rule of Evidence 702. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .29, 30, 34

Federal Rule of Civil Procedure 26 . . . . . . . . . . ... . . . . . . . . . . . . . . . . . . . . 54

Federal Rule of Civil Procedure 50 . . . . . . . . . . ... . . . . . . . . . . . . . . . . . . . . 20

Federal Rule of Civil Procedure 59 . . . . . . . . . . ... . . . . . . . . . . . . . . . . . . 21, 48

Federal Rule of Appellate Procedure 3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Federal Rule of Appellate Procedure 4. . . . . . . . . . . . . . . . ... . . . . . . . . . . . . . 2

Federal Rule of Appellate Procedure 28 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**STATEMENT OF**
**SUBJECT-MATTER AND APPELLATE JURISDICTION**

The district court had subject matter jurisdiction over this matter under diversity jurisdiction, 28 U.S.C. § 1332(a) because it involved citizens of different States. All plaintiffs are diverse from all defendants. Onemata is a Colorado corporation because its principal place of business is located in Colorado and Rahman and Arefin are citizens of Florida. D.E. 80 at p. 42 ¶ 1; D.E. 144 at p. 1-2 ¶¶ 1-2; D.E. 146 at p. 1-2 ¶¶ 1-2. The amount in controversy exceeds $75,000.00, exclusive of interest and costs because Onemata obtained a $7 million judgment against Rahman. D.E. 368.

Rahman incorporates the parties' Joint Response to [the] Court's Jurisdictional Questions, Rahman's Response to Supplemental Jurisdictional Statement, and Rahman's Notice of Filing District Court Order Granting Rahman's Motion to Correct Oversight by Amending Pleadings *Nunc Pro Tunc* or Alternatively Motion to Correct Oversight by Revising Judgment to Adjudicate all Claims as if fully stated herein to further demonstrate subject-matter jurisdiction. D.E. App. 28; D.E. App. 36; D.E. App. 41. The district court had supplemental jurisdiction and diversity jurisdiction over all other third-party claims Rahman brought.

The Eleventh Circuit has jurisdiction over this matter pursuant to 28 U.S.C. § 1291 because Rahman timely appealed the district court's Final Judgment and all

1

interlocutory orders merged therewith. D.E. 462. All appealed issues are final because they "end the litigation on the merits and leave[ ] nothing for the court to do but execute the judgment." *Pitney Bowes, Inc. v. Mestre,* 701 F.2d 1365, 1368 (11th Cir. 1983). The Final Judgment comprehensively "disposes of all parties' claims, or information establishing the court of appeals' jurisdiction" because the district court's final judgment intended to adjudicate all claims. *See* Fed. R. App. P. 28(a)(4)(D); *see also* D.E. 368 at p. 2 ¶ 3. To the extent a question lingered post judgment as to whether the final judgment adjudicated all claims, the district court foreclosed that question by entering an Order Granting Rahman's Motion to Correct Oversight by Amending Pleadings *Nunc Pro Tunc* or Alternatively Motion to Correct Oversight by Revising Judgment to Adjudicate all Claims as if fully stated in this statement of subject matter jurisdiction. D.E. 480 at p. 1; D.E. App. 41 at p. 7. This order adjudicated all claims dismissed by the parties. *Id*.

This appeal is timely because Rahman filed his Notice of Appeal within thirty days of the district court's Order. *See* Fed. R. App. P. 3, 4(a)(1)(A). The Order was entered December 7, 2022 and Rahman's Notice of Appeal was filed January 6, 2023. D.E. 440; D.E. 462. Therefore, Rahman's appeal is timely.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

Rahman presents five issues for review. They are:

1.      Whether the district court errored in denying Rahman's JMOL by finding that the jury could determine Rahman tortiously interfered with Onemata's customer.

2.      Whether the district court errored in denying Rahman's JMOL by finding that the jury had ample evidence to support its $5 million verdict for breach of contract against Rahman.

3.      Whether the district court abused its discretion in denying Rahman's Motion for New Trial and Remittitur by refusing to remit the jury's verdict to $657,215.88 (or alternatively $2,235,093 or $426,907) on Onemata's breach of contract claim.

4.      Whether the district court abused its discretion in requiring the parties to use a general verdict form on Onemata's breach of contract claims.

5.      Whether the district court abused its discretion by prohibiting Rahman's rebuttal computer expert from testifying about the full breath of his rebuttal opinions at trial.

## STATEMENT OF CASE AND FACTS

Rahman and Arefin each owned almost fifty percent of a growing profitable big data technology company called LocalBlox that specialized in the creation and sale of data and data platforms. D.E. 380 at p. 11:8-9; D.E. 383 at pp. 76:15-78:20; D.E. 386 at pp. 123:18-124:3. LocalBlox obtained raw data from web data sources and licensed raw data from many vendors. *See, e.g.*, D.E. 373-7; D.E. 373-34. LocalBlox then created and sold derivative data to its customers.

LocalBlox licensed data from vendors by entering into contracts with those vendors. LocalBlox entered a Data License Agreement with Acton and one or more data license contracts with X-Mode (collectively and "X-Mode Agreements"). D.E. 373-7; 373-12; 373-13 at p. 1; D.E. 375-2; D.E. 375-33; D.E. 380 at p. 179:18-19. Some X-Mode Agreements prohibited LocalBlox from disseminating X-Mode data to certain entities including Safegraph/VeraSet ("Safegraph"), Unacast, Factual, Twine (collectively the "Prohibited Customers") as early as February 19, 2019. D.E. 373-34 at p. 8 ¶ 5; D.E. 375-2 at p. 9 ¶ 5; D.E. 382 at p. 178:10-18; D.E. 384 at p. 132:9-14. In some instances, LocalBlox only used the licensed location data as a verification data set and in other instances, LocalBlox sold the data to customers (in derivative form). D.E. 373-7; D.E. 375-

2; D.E. 375-8; D.E. 382 at pp. 25:8-16, 77:14-24, 168:14-169:3, 183:12-17, 194:25-195:3, 196:14-23, 243:25-245:13; D.E. 383 at p. 149:2-5, 163:18-25.

LocalBlox used the computer servers of three customers to process data under certain customer platform deals. D.E. 375-1 at p. 4 ¶ 4(a); D.E. 375-35; D.E. 375-36; D.E. 381 at pp 138:15-139:13; D.E. 382 at pp. 243:25-245:15, 260:18-261:6; D.E. 383 at p. 120:16-22, 178:10-13, 179:12; D.E. 386 at pp. 138:24-142:5. The platform customers were TrueInfluence, Data Dynamix, and Sequoia Knows. D.E. 382 at pp. 133:6-8, 133:16-22; 152:4-17, 152:24-153:4, 161:9-12. Each of these customers authorized LocalBlox to process the raw data sets on their servers because they needed the data for their own use and allowed LocalBlox to retain ownership of the processed data. D.E. 375-1 at pp. 3 ¶ 3(c), 4 ¶ 4(a); D.E. 375-35; D.E. 375-36; D.E. 382 at pp. 99:22-100:25; D.E. 386 at pp. 138:24-142:5. LocalBlox saved a copy of the processed data to its own servers (because it retained ownership rights to that data) and sold the saved data to certain customers. D.E. 382 at pp. 100:12-101:10, 243:23-246:13.

Rahman and Arefin sold their LocalBlox equity to Onemata's predecessor in interest, Enscicon, for $7,567,920 under a Purchase Agreement dated December 18, 2019 (the "Purchase Date").[1] D.E. 373-2 at p. 1. Onemata paid

---

[1] Enscicon merged with Onemata, and Onemata was the surviving entity. D.E. 380 at p. 45:15-23; D.E. 381 at p. 15:13-18.

5

Rahman and Arefin $2 million in cash at closing, conveyed a 34% ownership interest in Onemata's predecessor valued at $2,573,093, and agreed to pay Rahman and Arefin the remaining balance of $2,994,826 under four promissory notes (the "Notes"). *Id*. at p. 2 ¶ 2.2.2; D.E. 373-41; D.E. 373-42; D.E. 373-43; D.E. 373-44; D.E. 381 at p. 40:15-21. Thereafter, Rahman became a LocalBlox employee and Arefin became a LocalBlox consultant. D.E. 373-4; D.E. 373-5.

The Purchase Agreement contained various representations and warranties requiring Rahman and Arefin to disclose certain facts about LocalBlox operations as of the Purchase Date. D.E. 373-2 at pp. 5-19; *Id*. at p. 6 ("The statements in this Article 4 are correct and complete as of the date of this Agreement and as of Closing."). Rahman and Arefin were purportedly required to disclose information about the data license agreements LocalBlox entered with Acton and X-Mode including the provision prohibiting LocalBlox from selling X-Mode data to Prohibited Customers. *Id*. at pp. 5, 7, 11-12, 16, 19. Rahman and Arefin were also purportedly required to disclose that LocalBlox processed data on some customer's servers and all other liabilities affecting LocalBlox. *Id*.

Onemata contends Rahman and Arefin breached the Purchase Agreement's representations and warranties in various ways including the concealment of (1) the X-Mode Agreements' prohibition against distributing data to Prohibited Customers (the "X-Mode Issue") and (2) using customer servers to process data

6

for other customers (the "Customer Server Issue"). D.E. 73 at pp. 9 ¶ 28, 11-12 ¶¶ 35-4, 21-22 ¶¶ 89-96. Therefore, Onemata refused to pay Rahman the Notes, terminated Rahman's employment, and sued Rahman in the United States District Court for the Southern District of Florida. *Id*. at pp. 9 ¶ 28, 11-12 ¶¶ 35, 37-39, 21-22 ¶¶ 89-96; D.E. 373-21; D.E. 373-22. Rahman countersued for breach of the Purchase Agreement and the Notes. D.E. 144 at pp. 22-30, 34-36.

TrueInfluence eagerly employed Rahman as chief scientist after Onemata terminated him from LocalBlox. D.E. 373-37 at p. 1; D.E. 373-39 at pp. 1-2; D.E. 382 at pp. 229:25-230:1; D.E. 383 at pp. 65:5-66:14. During this period, Rahman never disparaged Onemata to TrueInfluence. D.E. 383 at pp. 65:5-66:14; D.E. 385 at pp. 41:8-43:10, 48:10-49:21. TrueInfluence nevertheless stopped conducting business with LocalBlox because TrueInfluence and LocalBlox could not agree on renewed contract terms. D.E. 385 at pp. 42:22-44:15. Onemata blamed Rahman for causing TrueInfluence to terminate its relationship with LocalBlox. D.E. 73 at pp. 24-25:120-132. Therefore, Onemata amended its complaint to sue Rahman for tortious interference with the contractual relationships between LocalBlox and TrueInfluence. *Id*.

Trial was conducted in early September 2022. *See* D.E. 327. Onemata elicited fact testimony from its chief executive officer, Smith, and chief technology officer, Brad Brown ("Brown") about the X-Mode Issue and Customer Server Issue. *See*

7

*generally* D.E. 380 at pp. 39-253; D.E. 383 at pp. 93-221; D.E. 383 at p. 95:9-18, 95:23-24. Smith testified X-Mode discovered LocalBlox sold its data to prohibited parties and threatened a lawsuit. D.E. 380 at p. 189:12-23. Smith primarily based this testimony on a settlement agreement between X-Mode and LocalBlox that Rahman executed in August 2020 *after* Onemata purchased LocalBlox. D.E. 373-13; D.E. 380 at p. 184:9-22; D.E. 381 at pp. 173:19-175:5, 181:18-181:1. The settlement agreement states it "remains LocalBlox's position that it relicensed or sublicensed certain of the Data in a manner that was consistent with the Agreement." D.E. 373-13 at p. 1.

Smith admitted TrueInfluence and LocalBlox entered a contract allowing LocalBlox to process its data on TrueInfluence's servers (the "TrueInfluence Agreement"). D.E. 381 at p. 132:4-13; 375-1 at p. 3 ¶ 3(c). LocalBlox retained ownership rights to the processed data under the TrueInfluence Agreement. D.E. 381 at p. 138:15-23; D.E. 375-1 at p. 4 ¶ 4(a). TrueInfluence authorized LocalBlox to store its data on TrueInfluence's servers so long as TrueInfluence received some benefit therefrom. D.E. 381 at pp. 133:13-20, 138:6-11; *see also* D.E. 375-1 at p. 3 ¶ 3(c). TrueInfluence preferred that LocalBlox process the data on its own servers and knew it would incur the associated costs. D.E. 381 at pp. 132:14-20; 132:25-133:3; *see also* D.E. 384 at pp. 214:19-215:3; D.E. 385 at pp. 39:25-40:3. Smith was not able to provide any further detail on the issue because he was not the "right

person." Beyond that, Smith could not testify about the claim. D.E. 381 at p. 130:6-12. When Onemata informed TrueInfluence that LocalBlox "engaged in substantial fraud" with respect to its computer servers, TrueInfluence disbelieved Onemata and was unconcerned. D.E. 382 at p. 78:13-25.

Brown provided limited generalized testimony regarding the X-Mode Issue. Brown testified that Rahman switched from X-Mode data to Nybsys data in August 2020 because X-Mode discovered LocalBlox provided its data to Prohibited Customers. D.E. 383 at pp. 137:7-138:21. Brown also testified Rahman asked his subordinates to change certain computer code that referenced X-Mode to reference Nybsys around the same time. *Id*. at pp. 136:4-23, 137:5-138-25; *see also* D.E. 373-45. However, Brown did not know the date LocalBlox provided X-Mode data to Prohibited Customers and never performed the analysis needed to make this determination. D.E. 383 at pp. 198:7-14, 199:2-7, 199:21-200:3.

Brown also testified about the Customer Server Issue. However, Brown's testimony was limited to LocalBlox's use of TrueInfluence's servers. Brown testified that TrueInfluence knew LocalBlox ran its application program interfaces ("API") on TrueInfluence's environment because TrueInfluence preferred it that way. D.E. 383 at pp. 133:3-135:6, 184:18-185:9. LocalBlox's ability to use TrueInfluence's servers to process data was grey because parties can contract for such use. *Id*. at pp. 118:8-11, 120:16-22, 157:23-158:3, 180:3-10, 184:18-185:6,

186:9-187:12, 188:5-13, 190:5-16, 192:1-10. Onemata knew LocalBlox had a platform deal with TrueInfluence, but never reviewed LocalBlox's contract with TrueInfluence before the Purchase Date to determine whether LocalBlox's server use was permitted. *Id*. at pp. 178:10-179:20.

Onemata admitted an email chain to establish that LocalBlox distributed data to Prohibited Customers. The email chain was sent from a X-Mode executive to LocalBlox's data broker, Eric Reinertsen on April 16, 2020 (the "X-Mode Email"). D.E. 382 at pp. 187:21-188:10; D.E. 373-36 at p. 1. In the email chain, the X-Mode executive states "[w]e have strong written evidence from one of our partners that you guys or LocalBlox have leaked our data to Safegraph as soon as we turned on the international feed." D.E. 373-36 at p. 1. The email did not identify the date the international feed was turned on and no other evidence supplemented the record in this regard. *Id*.

Onemata admitted additional emails pertaining to the Customer Server Issue. In one email, Rahman provided Brown with login credentials to certain servers used by LocalBlox on December 25, 2019. D.E. 373-48. Rahman informed Brown that LocalBlox "spread[s] the various pieces running on various customer's infrastructures where [LocalBlox] control[s] root access while keeping backup at of all master resources on [LocalBlox's] end too." *Id*. Brown and Rahman exchanged another set of emails two days later about TrueInfluence's server costs. D.E. 373-

10

14; D.E. 380 at p. 147:19-23. Brown asked Rahman whether the server costs are correct and Rahman states that LocalBlox does not pay the server costs because it "distribute[s] the costs across customers." D.E. 373-14 at pp. 2, 5. In a third email, Onemata employee Benjamin Fuller asked Rahman to confirm whether LocalBlox migrated its data processing out of TrueInfluence's and Data Dynamix's environments in March 2020. D.E. 373-49 at p. 1. Rahman responded by stating that he is not a believer in putting more money in Jeff Bezos' pocket. *Id*. Onemata employee Brendon Bringham also emailed Rahman in July 2020 stating that TrueInfluence employee, Tapan, was concerned about increased server costs over the last few days. D.E. 373-48 at pp. 1-2.

Onemata introduced opinion testimony from computer expert Daniel O'Day ("O'Day") allegedly regarding the X-Mode Issue and Customer Server Issue. D.E. 384 at pp. 106-181. O'Day examined certain computer code associated with both issues to generate his opinions. This code allegedly came from LocalBlox contractor Maxim Kerimov ("Kerimov") in October 2020. D.E. 384 at pp. 115:24-116:25. O'Day reviewed the code to determine when it was created, when it came to exist in the locations searched, how it worked, and whether it was changed. *Id*. at pp. 113:9-115:5. However, O'Day's code review was limited because he could only review the code as it existed in October 2020. D.E. 384 at pp. 115:24-117:11, 146:10-19, 154:13-16, 155:17-18. O'Day was therefore precluded from reviewing preexisting

11

historical changes to the code (assuming any existed) before October 2020 because the necessary source code history was missing. *Id*.

O'Day opined that LocalBlox disseminated X-Mode data to its customers because X-Mode's data schema matched the data schema used by LocalBlox source code. D.E. 384 at p. 125:4-15. A data schema is the particular data format or structure associated with a data set. *See Id*. at pp. 124:2-24, 136:16-137:12. Geolocation data schema includes data fields for longitude, latitude, time stamp, and others. *Id*. at p. 124:2-10. The data field titles, the manner in which the data is expressed, and the order of the data fields comprises the schema. *Id*. at p. 124:2-18. O'Day reviewed X-Mode's data schema and the code LocalBlox used to distribute data to customers and concluded that LocalBlox's code carried X-Mode's data to customers sometime between September 2018 and May 2020. *Id*. pp. 124:19-130:3, 152:3-9, 153:1-154:1.

O'Day lacked critical information needed to formulate his opinions on the X-Mode Issue. O'Day did not know when LocalBlox customers received X-Mode data or which customers received the data. *Id*. at pp. 153:154-8. O'Day never received the code logs and server access, which identify when and whether the code was used. *Id*. at pp. 146:4-9, 147:17-148:10, 155:21-22. O'Day could not therefore determine whether LocalBlox used the code to distribute X-Mode data to customers prior to the Purchase Date. *Id*. In addition, O'Day never reviewed the X-Mode data or the

12

data LocalBlox provided to customers to determine whether it was the same. *Id*. at pp. 127:15-22, 149:4-12.

O'Day allegedly opined on the Customer Server Issue by concluding that LocalBlox used TrueInfluence's servers to process data. *Id*. at pp. 117:12-121:17. O'Day arrived at his conclusion by purportedly locating TrueInfluence's API key hardcoded within LocalBlox's code. *Id*. at pp. 117:12-123:3, 155:5-9. O'Day concluded that the presence of TrueInfuence's API key within LocalBlox's code demonstrated LocalBlox used TrueInfluence's API key to process certain data for other customers. *Id*. at pp. 117:12-123:3, 155:5-9. The key was used to obtain IP addresses from a third-party source and deliver that information to LocalBlox's customers (the "BidStream Process"). *Id*. However, O'Day never linked the API key to the Customer Server Issue. *Id*. Even if he could, the code logs tracking use dates for the BidStream Process demonstrated that it was sporadically used as early as January 2020 and then again in August 2020. *Id*. at p. 121:3-9. O'Day did not have any information indicating LocalBlox used the BidStream Process in 2019. *Id*. at pp. 158:11-19, 166:1-9. O'Day could not make additional findings regarding BidStream Process use dates because Onemata did not provide the requisite access to LocalBlox's servers and the BidStream Process code did not contain historical information predating October 2020. *Id*. at pp. 155:20-25, 156:9-21, 157:13-20, 159:8-13.

13

Rahman attempted to present contra-opinion testimony through his rebuttal expert, Dr. Eric Cole ("Dr. Cole"). *See* D.E. 171-4. Dr. Cole formulated many rebuttal opinions by analyzing production code provided by Rahman that differed from the code O'Day reviewed ("Production Code"). Production Code is the final version of code actually employed and used by LocalBlox. D.E. 171-4 at ¶¶ 23-26, 28-34. Onemata moved to strike Dr. Cole's opinions pre-trial by arguing they exceeded the scope of O'Day original opinions. D.E. 171 at pp. 4-5. Magistrate Snow granted Onemata's motion and Rahman timely objected by providing the district court with a chart correlating every Dr. Cole opinion with O'Day's opinions. D.E. 251 at pp. 15-19; D.E. 270 at pp. 7-11. The district court deferred ruling on Rahman's objection until trial because it wanted a proffer concerning the relationship between Dr. Cole's rebuttal opinions and O'Day's original opinions. D.E. 302 at p. 3. The requisite proffer was made, but the district court precluded Dr. Cole from testifying about Production Code. D.E. 385 at pp. 18:25-22:25 (ruling that Dr. Cole cannot testify about computer code provided by Mr. Rahman). The district court determined Rahman could not provide his expert additional code for review. *Id*.

Business valuation expert Ronald Seigneur ("Seigneur") provided evidence about the damages Rahman and Arefin allegedly caused Onemata due to their contractual breaches. *See, generally*, D.E. 384 at pp. 8-81. Seigneur opined that

14

LocalBlox's purported actual value as of the December 18, 2019 Purchase Date was $2,338,000 (the "Valuation") rather than the $7,567,902 value ascribed under the Purchase Agreement. D.E. 373-2 at p. 1; D.E. 384 at pp. 11:17-25, 18:8-14, 81:1-5. The difference between the Purchase Agreement value and Seigneur's Valuation comprised Onemata's primary damages evidence. D.E. 384 at pp. 18:8-14, 19:22-25; D.E. 387 at p. 62:11-23; s*ee also generally* D.E. 380; D.E. 381; 383; D.E. 385.

Seigneur valued LocalBlox based on two relevant sets of assumptions. First, Seigneur assumed Rahman and Arefin breached the Purchase Agreement's representations and warranties by causing LocalBlox to (1) conceal the distribution of X-Mode data to Prohibited Customers, (2) misuse customer servers to process data for other customers, and (3) refuse to pay sales tax. D.E. 384 at pp. 14:2-11, 19:21-20:7. However, Seigner's first set of assumptions were built on faulty premises. Seigneur relied on documents he could not recall and interviews with Smith and Onemata CFO, Jeff Dupont, for his assumption that LocalBlox distributed X-Mode data to prohibited customers. *Id*. at pp. 23:6-24:7, 25:18-26:7. Seigneur never determined whether LocalBlox could use TrueInfluence's servers to process data for other customers. *Id*. at pp. 64:14-20, 69:13-18. Seigneur could not recall whether Onemata claimed unpaid sales tax as an issue in its complaint. *Id*. at p. 22:17-22.

Seigneur's second set assumptions were that Rahman's and Arefin's contractual breaches occurred *before* Onemata purchased LocalBlox from Rahman and Arefin. D.E. 384 at pp. 13:15-14:1, 19:14-25. The breach date was a critical component to Seigneur's valuation opinion. *Id*. at p. 24:16-19. And Seigneur admitted the absence of this evidence could allow for the possible repudiation of his opinions. *Id*. at p. 26:3-7.

Onemata admitted additional evidence purportedly relating to its damages caused by Rahman's breach of the Purchase Agreement. These damages were $80,000 resulting from a settlement agreement between ACTON and LocalBlox, $15,000 resulting from a debt LocalBlox owed an accounting firm called Embark Consulting, $307,215.88 resulting from unpaid server bills due to Amazon Web Services, and $255,000 resulting from Arefin's unilateral withdrawal of cash from LocalBlox's bank account. D.E. 373-9; D.E. 373-11; D.E. 373-31; D.E. 380 at pp. 68:16-69:20, 166:20-23, 176:7-19, 199:20-23.

Rahman moved to strike O'Day and Seigneur and moved for judgment as a matter of law at the close of Onemata's evidence because the Valuation was not supported by trial evidence. D.E. 385 at pp. 4:12-12:6. Rahman also moved for judgment as a matter of law because Onemata failed to present evidence on its tortious interference claim. D.E. 386 at pp. 5:16-44:22. Therefore, no reasonable jury could find that Onemata was damaged. D.E. 385 at pp. 4:12-8:3; D.E. 386 at pp.

19:11-22, 21:16-23:4, 35:7-37:22. The district court denied Rahman's motions. D.E. 385 at pp. 11:22-12:3.

The jury returned a verdict for Onemata on all issues. D.E. 364. The jury determined Rahman and Arefin were liable to Onemata for $5,000,000 in contract damages and Rahman was liable to Onemata for $2,000,000 in tortious interference damages. *Id* at pp. 1-2. The jury also determined that Onemata was not required to pay Rahman under the Notes or for breaching the Purchase Agreement. *Id*. at pp. 2-4. Judgment was entered for Onemata as a result. D.E. 368.

Rahman timely renewed his motion for judgment as a matter of law, sought a new trial, requested an amended judgment, and asked for a remittitur under Federal Rules of Civil Procedure 50 and 59 (the "Motion"). D.E. 393. Each issue raised in Rahman's Motion was brought under Rules 50 and 59. *Id*. at p. 1 (Rahman "moves for judgment as a matter of law, a new trial, an amended judgment, and a remittitur pursuant to Federal Rules of Civil Procedure Rule 50 and 59 on each and every argument presented below."). However, the district court denied Rahman's JMOL finding that "there was ample, and competent evidence adduced at trial to support an award." D.E. 440 at p. 6. Rahman timely lodged this appeal as a result. D.E. 462.

## SUMMARY OF THE ARGUMENT

The district court errored in denying Rahman's JMOL because a reasonable jury could not conclude Rahman tortiously interfered with a relationship between Onemata and TruInfluence. Onemata never presented evidence demonstrating it had any legally cognizable relationship with TrueInfluence. The only evidence on the issue established a relationship between LocalBlox and TrueInfluence. Onemata was careful to testify during trial that it was a separate and distinct company from LocalBlox. Therefore, a reasonable jury could not conclude LocalBlox's relationship with TrueInfluence gave rise to Onemata's tortious interference claim.

The district court also errored in denying Rahman's JMOL because a reasonable jury could not conclude Onemata was damaged in an amount of $5 million based on Seigneur's Valuation. The Valuation hinged on the X-Mode Issue and Customer Server Issue occurring on or before the Purchase Date. Onemata failed to prove either occurred before the Purchase Date. Seigneur's Valuation also hinged on LocalBlox's refusal to pay sales tax, which was never an issue in the case. Onemata did not have additional competent damages evidence because it lacked standing. Therefore, a reasonable jury could not rely on Seigneur's Valuation or other damages evidence in entering its verdict against Rahman.

18

The district court abused its discretion for in denying Rahman's request for a new trial and remittitur because the only potentially reliable damages evidence demonstrated Onemata was only damaged in the amount $657,215.88 or alternatively in the amount of $2,235,093.

The district court also abused its discretion in allowing a general verdict form on the question of breach of contract because it prohibits the parties from deciphering liability issues and damages issues post-trial.

The district court further abused its discretion by prohibiting Dr. Cole from testifying about his full rebuttal opinion. Dr. Cole opined about the Production Code O'Day never reviewed. Dr. Cole's rebuttal opinion was permissible because rebuttal experts can review new material the original expert did not review so long as the new material broadly relates to the same subject matter as the original opinion.

## STANDARDS OF REVIEW

**A.    The standard of review for denying Rahman's Renewed Judgment as a Matter of Law and for New Trial under Rule 50 is *de novo*.**

*De novo* is the correct standard of review when determining whether a district court correctly ruled on a JMOL for judgment as a matter of law. *McGinnis v. Am. Home Mortg. Serv., Inc.*, 817 F.3d 1241, 1254 (11th Cir. 2016) (A "motion for judgment as a matter of law is reviewed *de novo*, applying the same legal standard as the district court." (quoting *Bianchi v. Roadway Express, Inc*., 441 F.3d 1278, 1282 (11th Cir. 2006))). This Court must therefore review the trial evidence at the time Onemata closed its case to determine whether the district court correctly determined such evidence warranted a jury's evaluation. *Nat'l Fire Ins. Co. of Hartford v. Fortune Constr. Co*., 320 F.3d 1260, 1267-68 (11th Cir. 2003) ("We review a district court's grant of judgment as a matter of law *de novo*, evaluating whether such sufficient conflicts exist in the evidence to necessitate submitting the matter to the jury or whether the evidence is so weighted in favor of one side that one party must prevail as a matter of law." (quoting *Thosteson v. United States*, 304 F.3d 1312, 1316 (11th Cir. 2002))); *Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1186 (11th Cir. 2001) ("A party's motion for judgment as a matter of law can be granted at the close of evidence or, if timely renewed, after the jury has returned its verdict." (quoting Fed. R. Civ. P. 50)).

**B.    The standard of review for denying Rahman's Motion for New Trial, to Amend Judgment, and to Remit the Verdict under Rule 59 is abuse of discretion**.

The abuse of discretion standard of review applies to motions brought under Federal Rule of Civil Procedure 59(a) and 59(e). *Guice v. Postmaster Gen., U.S. Postal Serv.*, 718 Fed. Appx. 792, 797 (11th Cir. 2017) ("We review the district court's denial of motions brought under Rules 59(a) [and] 59(e) for abuse of discretion."). Therefore, appellate court's must determine whether the district court abused its discretion in denying a motion for new trial, denying a motion to amend final judgment, and denying a motion to remit a verdict. *See Am. Builders Ins. Co. v. S.-Owners Ins. Co.*, 56 F.4th 938, 944 (11th Cir. 2023) ("We review a ruling on a motion for a new trial for abuse of discretion," giving deference to the district court "where a new trial is denied and the jury's verdict is left undisturbed." (quoting *McGinnis* 817 F.3d at 1255); *Thomas v. Farmville Mfg. Co., Inc.*, 705 F.2d 1307, 1307 (11th Cir. 1983) ("The standard of review for a denial of leave to amend, and for denial of a Rule 59(e) motion, is abuse of discretion."); *Bonura v. Sea Land Serv., Inc.*, 505 F.2d 665, 669 (5th Cir. 1974) ("The trial court will be reversed only if the party opposed to the remittitur shows an abuse of discretion on the part of the judge.").[2]

---

[2] *See also Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc*) (the Eleventh Circuit adopting all decisions of the former Fifth Circuit handed down prior to October 1, 1981 as binding precedent).

**C.    The standard of review for determining whether the district court errored in excluding Dr. Cole's full rebuttal opinion and allowing a general verdict form was abuse of discretion**.

"Rulings on the admissibility of evidence are reviewed for abuse of discretion." *City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 556 (11th Cir. 1998).

"The district court's application of Rule 49(b) is reviewed only for abuse of discretion." *Christiansen v. Wright Med. Tech., Inc.*, 851 F.3d 1203, 1213 (11th Cir. 2017).

**ARGUMENT**

**A.    Onemata's tortious interference claim was not supported by competent trial evidence because Onemata did not (1) possesses a contractual or business relationship with TrueInfluence and (2) establish damages resulting from Rahman's alleged tortious interference.**

A reasonable jury could not conclude Rahman tortiously interfered with a customer or contractual relationship between Onemata and TrueInfluence because Onemata failed to prove the existence of any such relationship. Onemata bore the burden of proving it had a business or contractual relationship with TrueInfluence and that it was damaged by a tortious severance of that relationship. *See Ahern v. Boeing Co.*, 701 F.2d 142, 144 (11th Cir. 1983) (the plaintiff must prove the defendant intentionally and unjustifiably interfered with an existing business relationship, which caused damages to the plaintiff to establish a *prima facie* claim for tortious interference). Onemata failed to present evidence during trial on both issues.

**1.    Onemata failed to prove it had a contractual relationship or business relationship with TrueInfluence.**

No reasonable jury could conclude Rahman tortiously interfered with a contract between Onemata and TrueInfluence because Onemata failed to prove it entered a valid contract with TrueInfluence. Two TrueInfluence contracts were admitted into evidence during trial. TrueInfluence entered the first contract with LocalBlox in 2018. D.E. 373-29 at pp. 1, 13. Onemata is not a party to this contract,

23

is not referenced in the contract, and is not a third-party beneficiary to the contract. *Id.* at pp. 1-14. Assignment under the 2018 contract is prohibited without prior written consent, and no party introduced a writing establishing consent to assignment. *Id.* at p. 11 ¶ 25.

TrueInfluence entered a second contract with LocalBlox in 2019. D.E. 373-23 at pp. 1, 5. Onemata is not a party to the second contract, is not referenced in the second contract, and is not a third-party beneficiary to the second contract. *Id.* at pp. 1-6. The second contract was an amendment to the first contract, therefore, the anti-assignment provision contained within the first contract applies to the second contract. *Id.* at p. 1; D.E. 373-29 at p. 11 ¶ 25.

The unrebutted evidence demonstrates Onemata never entered a contract with TrueInfluence. Therefore, a reasonable jury could not conclude Rahman tortiously interfered with a contract between Onemata and TrueInfluence. *See ISS Cleaning Services Group, Inc. v. Cosby,* 745 So. 2d 460, 462 (Fla. 4th DCA 1999) (The court errored in denying the motion for directed verdict on the plaintiff's tortious interference claim because the plaintiff "failed to present competent substantial evidence of an actual and identifiable SPA between [the customer] and himself.").

No reasonable jury could conclude Rahman tortiously interfered with a business relationship between Onemata and TrueInfluence because Onemata failed to prove it had such a relationship. Smith admitted TrueInfluence was *LocalBlox's*

24

*customer* and further admitted that *TrueInfluence was not Onemata's customer.* D.E. 381 at pp. 58:20-59:2. Smith's uncontradicted admissions prohibited the jury from finding that Rahman tortiously interfered with any business relationship between Onemata and TrueInfluence because no such relationship could exist based on the trial evidence. *Id*. The jury's disregard for the trial evidence requires reversal (under the *de novo* standard) because its verdict is not supported by the evidence. D.E. 364 at p. 2; *see ISS Cosby,* 745 So. 2d at 462.

Onemata attempted to establish its relationship with TrueInfluence through testimony allegedly provided by Craig Smith when arguing in opposition to Rahman's Renewed Judgment as a matter of law. D.E. 413 at p. 22. Onemata argued Craig Smith testified that "Onemata was in the process of renegotiating the True Influence Agreement, as amended." *Id.* (failing to provide any record citation). However, Craig Smith never actually testified during trial. *See, e.g*., D.E. 380; D.E. 381; D.E. 382; D.E. 383; D.E. 384; D.E. 385; *see also* D.E. 385 at pp. 17:21-18:10 (ruling that Rahman's motion for judgment as a matter of law would only take evidence into account as of the moment Onemata rested its case). As a result, the jury never considered this evidence and neither could the district court when ruling on the JMOL. But even if Craig Smith did testify as argued by Onemata, such testimony does not establish a relationship between Onemata and TrueInfluence because Onemata was still in the process of negotiating a relationship with

TrueInfluence. As a result, Onemata had not yet formed the requisite relationship needed for a tortious interference claim. *See Lake Gateway Motor Inn, Inc. v. Matt's Sunshine Gift Shops, Inc.*, 361 So. 2d 769, 772 (Fla. 4th DCA 1978) (refusing to find the existence of a business relationship because there were no legal rights between the two operators); *Realauction.com, LLC v. Grant St. Group, Inc.*, 82 So. 3d 1056, 1060 (Fla. 4th DCA 2011) ("Speculative hope of future business is not sufficient to sustain the tort of interference with a business relationship.").

**2.    Onemata failed to prove it was damaged as a result of Rahman's tortious interference with its alleged relationship with TrueInfluence.**

No reasonable jury could conclude Onemata was damaged due to Rahman's alleged tortious interference because Onemata failed to admit any damages evidence on the issue. *See Alphamed Pharm. Corp. v. Arriva Pharm., Inc.,* 432 F. Supp. 2d 1319, 1352 (S.D. Fla. 2006), *aff'd,* 294 Fed. Appx. 501 (11th Cir. 2008) ("Because AlphaMed was unable to prove its entitlement to lost profit damages, the only measure of damages sought, AlphaMed's claim for tortious interference fails as a matter of law."); *Imperial Majesty Cruise Line, LLC v. Weitnauer Duty Free, Inc.,* 987 So. 2d 706, 708 (Fla. 4th DCA 2008) ("We further reverse as to the nominal damages award because proof of actual damages is an element of a cause of action for tortious interference, and, as the trial court found, WDF failed to prove actual damages."). The 2018 contract between TrueInfluence and LocalBlox does not provide the requisite damages evidence because it does not contain a price term.

Instead, the 2018 contract references a separate statement of work (SOW) that was never introduced as evidence. D.E. 373-29 at p. 5 ¶ 6 ("As compensation for the Services Software license and other rights granted herein or in any SOW, TrueInfluence agrees to pay LocalBlox the fees set forth in the applicable SOW Net 60."). Although the 2019 contract between TrueInfluence and LocalBlox does contain price terms, these terms are inapplicable because the parties transitioned to a different month-to-month arrangement by the time Rahman purportedly interfered in the relationship. D.E. 382 at p. 222: 9-16; D.E. 385:42:22-43:14.

The price term in the 2019 contract is also inapplicable because it contains a formula for determining payment to *LocalBlox* based on the greater of $17,000 per month or 9% of qualifying revenue. D.E. 373-23 at p. 4. Onemata never introduced evidence establishing the value of the 9% of qualifying revenue or how long it would receive these payments from TrueInfluence in the future. *Brough v. Imperial Sterling Ltd.*, 297 F.3d 1172, 1177 (11th Cir. 2002) (reversing the jury's verdict because "'future commissions on other Florida properties' was based on speculation that ISL would sell its property."). Therefore, any reliance by the jury on this formula to arrive at its $2 million damages award against Rahman for tortious interference is impermissible speculation. *See Ctr. Chem. Co. v. Avril, Inc.*, 392 F.2d 289, 290 (5th Cir. 1968) ("There can be no recovery under Florida law where the evidence is not

sufficient to enable the jury to assess damages with a reasonable degree of certainty without leaving the amount awarded to speculation and conjecture.").

The district court errored in refusing the grant Rahman's JMOL because a plaintiff is not entitled to nominal damages for a tortious interference claim. The district court denied Rahman's judgment as a matter of law tortious interference arguments during trial because it believed the jury could award nominal damages on the issue. D.E. 386 at pp. 199:10-18. *It could not*. *See Alphamed Pharm. Corp.,* 432 F. Supp. 2d at 1352; *Imperial Majesty Cruise Line, LLC,* 987 So. 2d at 708. Therefore, the district court errored in refusing to grant judgment as matter of law during trial and errored again in refusing to grant the same request post-trial.

28

**B.    No reasonable jury could return a $5 million verdict in favor of Onemata on its breach of contract claims because the trial evidence is legally insufficient to support that verdict.**

Seigneur's Valuation cannot stand because Onemata failed to provide facts substantiating the three bases of Seigneur's Valuation. An expert can only provide opinion testimony if that testimony is based on sufficient facts or data. Fed. R. Evid. 702 (b); *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 580 (1993) (Rule 702 requires district courts to ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."). Baseless, conclusory, and self-supporting evidence do not satisfy the evidentiary requirement needed for expert opinion. *See, e.g., Ralston Purina Co. v. Hobson,* 554 F.2d 725, 728-29 (5th Cir. 1977) ("[C]ompletely self-serving testimony, unsupported by other evidence and in the teeth of universal experience, will not support a jury verdict."); *Yoder Bros., Inc. v. California-Florida Plant Corp.,* 537 F.2d 1357, 1371 (5th Cir. 1976) ("[T]he isolated self-serving statements of the Cal-Florida officers were not enough to constitute substantial evidence for the jury on the causation issue[.]"). Therefore, expert opinion testimony must be excluded when it is not premised on trial evidence. *See United States v. 0.161 Acres of Land,* 837 F.2d 1036, 1040 (11th Cir. 1988) ("Certainly where an expert's testimony amounts to no more than a mere guess or speculation, a court should exclude his testimony."); *Iden v. Kasden,* 609 So. 2d 54, 57 (Fla. 3d DCA 1992) ("[T]here were simply no foundation facts upon which [the]

29

expert opinion could be based. Consequently, there is no reason to consider that testimony.").

Onemata bore the burden of proving all three bases of Seigner's Valuation as the plaintiff asserting the breach of contract claims against Rahman. Fed. R. Evid. 702 (b); *Hobson,* 554 F.2d at 728-29; *Yoder Bros., Inc.,* 537 F.2d at 1371. Consequently, Onemata had to prove Rahman breached the Purchase Agreement by causing LocalBlox to distribute X-Mode data to Prohibited Customers, misuse customer servers, and fail to pay sales tax. D.E. 384 at pp. 14:2-11, 19:22-20:7. *Each breach had to occur on or before the Purchase Date because that was the date of Seigneur's Valuation.* D.E. 384 at pp. 11:17-25, 13:13-14:11. Onemata failed to carry its burden on each breach because (1) no evidence established that LocalBlox distributed X-Mode to Prohibited Customers prior to the Purchase Date, (2) no evidence established that LocalBlox misused customer servers prior to the Purchase Date, and LocalBlox's purported failure to pay sales tax was never pleaded. A reasonable jury could not therefore rely on Seigneur's Valuation to arrive at its $5 million verdict because the opinion was not supported with any evidence. *See Hobson,* 554 F.2d at 728-29. Consequently, judgment should be granted in favor of Rahman, or a new trial should be awarded on all issues of liabilities and damages, including Rahman's counterclaims for breaching the Notes because the issues

30

surrounding the Notes were tethered to the X-Mode Issue and Customer Server

Issue. *See infra* at pp. 48-49.

**1.    Seigneur could not predicate his Valuation on LocalBlox's distribution of X-Mode data to Prohibited Customers because Onemata failed to prove the distribution occurred between February 12, 2019 and December 18, 2019.**

Onemata's fact witnesses failed to establish that Rahman breached the

Purchase Agreement by causing LocalBlox to disseminate X-Mode data to

Prohibited Customers on or before the Purchase Date. Smith testified LocalBlox sold

X-Mode data to Prohibited Customers. D.E. 380 at p. 180:10-24. However, Smith

never indicated when the sale or transmission occurred. *Id*. Brown provided

generalized testimony that LocalBlox violated the X-Mode Agreements by

providing X-Mode data to all LocalBlox customers at some unknown point in time.

D.E. 383 at pp. 149:2-5, 199:10-20. Brown did not know whether LocalBlox

provided X-Mode data to the Prohibited Customers before or after the Purchase

Date. D.E. 383 at pp. 198:7-14, 199:21-200:3. Brown never performed an analysis

to determine when the data was provided. D.E. 383 at p. 199:2-7.

Onemata's computer expert similarly failed to establish that Rahman breached

the Purchase Agreement by causing LocalBlox to disseminate X-Mode data to

Prohibited Customers on or before the Purchase Date. O'Day nebulously testified

that LocalBlox provided X-Mode data to Prohibited Customers "between September

of 2018 and May of 2020." D.E. 384 at pp. 129:23-24, 152:3-9. O'Day did not know

whether X-Mode data was provided to Prohibited Customers in 2019. *Id.* at p. 159:1-4 (Q.: "Did LocalBlox sell data to customer in 2019, do you know"? A.: "Again, I don't know their business but I would assume that yes."). Any testimony to the contrary was mere assumption, speculative, and lacked foundation. *Id*. Therefore, Seigneur did not have a factual basis to devalue LocalBlox based on its alleged provision of X-Mode data to Prohibited Customers before the Purchase Date.

The distribution of X-Mode data to Prohibited Customers between September 1, 2018 and February 11, 2019 cannot constitute a breach of the Purchase Agreement's representations and warranties because the earliest possible X-Mode Agreement prohibiting LocalBlox from distributing X-Mode data to Prohibited Customers became effective on February 12, 2019. D.E. 373-28 at p. 1; D.E. 373-34 at pp. 1, 6; 375-2 at p. 7. Therefore, O'Day's opinions regarding LocalBlox's purported provision of X-Mode data to Prohibited Customers between September 1, 2018 and February 11, 2019 are moot. LocalBlox was not contractually prohibited from selling X-Mode data to anyone before February 12, 2019 at the earliest. D.E. 373-34 at pp. 1, 6. Rahman, correspondingly, could not breach the Purchase Agreement's representations and warranties by concealing the distribution of X-Mode data to the Prohibited Customers between September 1, 2018 and February 11, 2019.

The X-Mode Email does not substantiate Seigneur's Valuation or demonstrate that Rahman breached the Purchase Agreement for four reasons. First, Seigneur did not know whether he possessed the X-Mode Email or used it to form the basis of his valuation. D.E. 384 at pp. 78:21-79:10. Second, the X-Mode executive authoring the X-Mode Email does not know whether LocalBlox or Mr. Reinertsen leaked the data to Prohibited Customers. D.E. 373-36 at p. 1 ("We have strong written evidence... you guys _or_ LocalBlox leaked out data to Safegraph) (emphasis supplied). Third, the X-Mode Email is limited to data leaked to Safegraph, and does not implicate a data leak to any other Prohibited Customer. The data leak to Safegraph was resolved in settlement agreement entered August 2020. D.E. 373-13 at p. 1.

Fourth, Onemata never presented evidence identifying the date X-Mode turned the international feed on. The X-Mode Email was sent April 16, 2020, thereby suggesting X-Mode turned the international feed on sometime in April 2020. D.E. 373-36 at p. 1. Although Onemata argued to the district court that X-Mode turned the international feed on under a February 2019 agreement, Onemata's argument has no support. D.E. 413 at p. 7 (relying on D.E. 373-34). The February 2019 agreement between X-Mode and LocalBlox does not contemplate the provision of international data. _See_ D.E. 373-34 at pp. 1, 7 ¶ 1 (omitting international feed data from the list of deliverables and requiring LocalBlox to pay $7,500 for the data feed). The earliest contracts contemplating international data were executed in mid-December 2019.

D.E. 373-12 at p. 1 (including USA data and international global SDK Raw Data and increasing the costs to from $7,500 to $40,000 as a result); D.E. 385 at pp. 84:20-85:13 (testifying that the December 2019 contract upgraded the data feed from "just U.S" to add international). But no evidence suggests X-Mode turned the international data feed on in December 2019.

Onemata's inability to prove LocalBlox breached the X-Mode Agreements before the Purchase Date prohibits Seigneur from relying on this as a basis to value LocalBlox as of December 18, 2019. *See* Fed. R. Evid. 702; *Jones v. Otis Elevator Co.,* 861 F.2d 655, 661 (11th Cir. 1988) (An expert's testimony must be based on "facts which enable him to express a reasonably accurate conclusion as opposed to conjecture or speculation."). By extension, a reasonable jury could not rely on Seigneur's Valuation to ascertain Onemata's contract damages because the Valuation was built on a faulty premise. Therefore, judgment as a matter of law should be entered in favor of Rahman because no reasonable trier of fact could conclude that Onemata suffered $5 million dollars in contract damages based on the evidence presented at trial and the Valuation.

**2.     Customer server misuse is not a valid basis for Seigneur's Valuation because no evidence demonstrated that Rahman caused LocalBlox to misuse customer servers on or before the Purchase Date.**

Smith failed to establish that Rahman breached the Purchase Agreement by causing LocalBlox to misuse its customers servers to process data before the

Purchase Date. Smith broadly generalized that LocalBlox used TrueInfluence's, Data Dynamix's, and Sequoia Knows' servers to process data for other LocalBlox customers without providing the dates of such use. *See, e.g.,* D.E. 380 at pp. 147:5-148. Smith deferred to Brown and O'Day for the details regarding LocalBlox's customer server use because he lacked the technological sophistication needed to review computer logs and determine the date LocalBlox processed data on customer servers. D.E. 381 at pp. 129:2-17, 130:1-5. Even if Smith was capable of performing the necessary analysis, he could not do so because Onemata never possessed the computer logs. D.E. 381 at p. 130:6-12.

Brown lacked the factual predicate needed to testify about the date LocalBlox used TrueInfluence's servers or API key to process data for other LocalBlox customers before the Purchase Date because Brown did not know what version of LocalBlox computer code ran on each server. D.E. 383 at p. 178:4-9. Although Brown testified that LocalBlox used TrueInfluence's API key to obtain and process data on TrueInfluence's servers for LocalBlox customers, Brown never testified that LocalBlox used TrueInfluence's API before the Purchase Date. D.E. 383 at pp. 133:3-134:25. Brown even suggested that such use occurred *after* the Purchase Date because TrueInfluence allegedly shut down LocalBlox's APIs sometime after Onemata controlled LocalBlox. *See* D.E. 383 at pp. 135:2-136:3 (testifying that Onemata discovered the issue after TrueInfluence shut down LocalBlox's APIs,

thereby causing LocalBlox customer Strider to complain). In any event, Brown believed TrueInfluence was upset with Onemata's decision to cause LocalBlox's to migrate off of TrueInfluence's environment. D.E. 383 at p. 190:20 – 191:3. Brown was also unsure whether LocaBlox's customer server use was improper because it was a grey area. D.E. 383 at pp. 118:8-11, 120:16-22, 157:23-158:3, 180:3-10, 184:18-185:6, 186:9-187:12, 188:5-13, 190:5-16, 192:1-10.

O'Day failed to supply the missing evidence Smith and Brown could not provide regarding the date LocalBlox allegedly misused its customers servers. As a threshold matter, O'Day never linked his opinions regarding LocalBlox's use of TrueInfluence's API key with LocalBlox's misuse of customer servers. O'Day's computer code examination was also limited to code functions as of October 8, 2020. O'Day reviewed LocalBlox computer code provided to Onemata on October 8, 2020. D.E. 384 at pp. 115:24-116:25, 154:13-16, 156:9-17, 158:2-7. This code did not contain historical changes predating October 8, 2020. D.E. 384 at pp. 116:18-25, 146:10-19, 157:13-20.

The computer logs associated with the code O'Day reviewed demonstrated it was only used in January 2020 and August 2020. D.E. 384 at pp. 121:3-9, 155:23-25, 158:11-15, 159:15-21. No evidence demonstrated the code was ever used in 2019, and O'Day was unable to access computer servers running the code to determine whether it was used on other dates. D.E. 384 at pp. 147:5-20, 156:1-21.

Therefore, O'Day's opinions do not provide Seigneur with a basis for his Valuation because the earliest date O'Day could identify use of TrueInfluence's servers or the API key was January 2020 – about two weeks after the Purchase Date.

Two December 2019 email exchanges between Rahman and Brown do not demonstrate LocalBlox's customer server misuse occurred on or before the Purchase Date because LocalBlox was contractually authorized to access and use TrueInfluence's servers. D.E. 373-29 at p. 3-4, ¶¶ 3(c) ("TrueInfluence acknowledges and agrees that LocalBlox will control all servers storing LocalBlox Data, and Software."). TrueInfluence corroborated this point. D.E. at pp. 385:39:25-40:3. And Onemata admitted this fact. D.E. 381 at 130:25-131:8, p. 132:4-17 (Smith admitting LocalBlox was permitted to run its software on TrueInfluence's servers under the platform deal), p. 133:13-20 (Smith admitting TrueInfluence permitted LocalBlox to store its data on TrueInfluence's server), pp. 138:15-139:13 (Smith admitting LocalBlox retained ownership rights to its data contained on TrueInfluence's server), p. 153:4-21 (Smith admitting LocalBlox had authority to control all TrueInfluence servers storing LocalBlox data and software), p. 149:13-23; D.E. 384 at pp. 214:19-215:3 (TrueInfluence's corporate representative testifying that LocalBlox could use its servers for data processing and TrueInfluence would pay the expense). Therefore, both email exchanges cannot demonstrate

37

LocalBlox misused TrueInfluence's servers before the Purchase Date. *See* D.E. 373-14; D.E. 373-48.

The two remaining emails Onemata offered into evidence to establish the Customer Server Issue are similarly unavailing because they were written several months after the Purchase Date and pertained to issues arising several month after the Purchase Date. Onemata employee Benjamin Fuller asked Rahman to confirm the cessation of server operations activity unrelated to TrueInfluence and Data Dynamix in March 2020, and Onemata employee Brendon Brigham inquired as to TrueInfluence's June 2020 concerns over increased server costs. D.E. 373-47 at p. 1-2; D.E. 373-49; *see also* D.E. 380 at pp. 151:24, 153:23. Both emails do not demonstrate LocalBlox misused TrueInfluence's and Data Dynamix's servers before the Purchase Date because they were sent in March and July of 2020 respectively. D.E. 373-47 at p. 1-2; D.E. 373-49. The emails do not reference pre-Purchase Date conduct. D.E. 373-47 at p. 1-2; D.E. 373-49. For example, the June 2020 email reference server activity "over the last few days. D.E. 373-47 at p. 1. Therefore, Seigneur's Valuation cannot stand, and a reasonable jury could not base its $5 million verdict on Seigneur's Valuation.

Onemata may advance certain testimony Rahman provided during trial in its answer brief to demonstrate that LocalBlox used customer servers prior to the Purchase Date. D.E. 413 at p. 6 (citing D.E. 382 at 98: 18-21; 133: 6-12, 23-25; 134:1-

8, 23-25; 135:1-14; 151:3-25; 152:1-10; and 154:9-19). In this testimony, Rahman admits some customer server use was part of LocalBlox's business model. *Id.* However, Rahman's testimony on this subject does not demonstrate LocalBlox *misused* customer servers prior to the Purchase Date or that he processed data for other customers. Instead, Rahman's testimony demonstrates LocalBlox used customer servers to provide certain services as authorized by those customers and consistent with contract terms. D.E. 375-1 at pp. 3 ¶ 3(c), 4 ¶ 4(a); D.E. 382 at 98:18-21. Therefore, Rahman's testimony on the customer server misuse issue does not support Seigneur's Valuation.

### 3.    Unpaid sales tax is not a basis to value LocalBlox.

Unpaid sales tax is not, and never was, an issue in this case. Onemata asserts 58 detailed allegations concerning Rahman's misdeeds giving rise to its breach of contract claims. D.E. 71 at ¶¶ 16-74, 91. No allegation pertains to unpaid LocalBlox sales tax and no evidence established the amount of outstanding sales tax as of the Purchase Date. *Id.* Onemata does even know whether Seigneur considered the sales tax issue as part of his Valuation. *See* D.E. 413 at p. 12 ("…The sales tax issue was *likely* presented to [Seigneur] before he prepared his report… and ultimately [ ] an 'open question' as to how it would be treated."). Therefore, the sales tax issue was never part of this case and never tried by consent. *See Cioffe v. Morris,* 676 F.2d 539, 541 (11th Cir. 1982) ("[A] judgment may not be based on issues not presented

in the pleadings and not tried with the express or implied consent of the parties."); *Ramjeawan v. Bank of America Corp.,* 2010 WL 18882262, at *2 (S.D. Fla. May 11, 2010) (Rule 54 "creates no entitlement to relief based on issues not squarely presented and litigated at trial" and, therefore, "judgment may not be based on issues not presented in the pleadings and not tried with the express or implied consent of the parties."). A reasonable jury could not, correspondingly, accept Seigneur's Valuation and award Onemata $5 million in damages because the sales tax issue was not a proper basis for the Valuation.

Onemata will likely argue two documents admitted into evidence supported the sales tax Valuation issue and enabled a reasonable jury to find $5 million in damages. *See* D.E. 413 at pp. 11-12 (citing D.E. 373-19 and 375-11). One document was a Financial Statement and Independent Accountants' Review Report. *See* D.E. 373-19. However, once Onemata began using the report to question Smith about unpaid sales tax, Rahman objected because the issue was not pleaded. D.E. 380 at p. 211:12-25. The district court sustained the objection because Onemata could not confirm that the issue was contained in its complaint. *Id*. The second document was an email between Smith and Onemata's accountant that contains vague references to sales tax. D.E. 375-11 at ¶ 11. The email was not introduced for the purpose of establishing the sales tax issue and Smith was never questioned about sales tax based on this email. *See* D.E. 381 at pp. 78:24-81:2. In addition, the emails own verbiage

demonstrates the sales tax issue is an unknown because research and analysis was never performed. D.E. 373-11 at ¶ 11 ("We have not done the research to determine whether their sales are subject to sales tax. The first step is to identify the proper nexus by State of the revenue. Some States do tax data sales. Their home state of Washington taxes services. This is an area that needs to be looked into.").

### 4.    Onemata cannot disassociate from the foundational elements of Seigneur's Valuation.

Onemata may attempt to disassociate from the foundational elements of Seigneur's Valuation by arguing that the Valuation was not based on the X-Mode Issue and Customer Server Issue. *See* D.E. 413 at pp. 3, 12. The Court should reject these anticipated arguments because Seigneur explicitly testified that his Valuation was premised on three specific allegations relating to Onemata's claims against Rahman for breach of the Purchase Agreement. D.E. 384 at pp. 13:17-14:25. These three allegations were the distribution of X-Mode data to Prohibited Customers, LocalBlox's misuse of customer servers to process data for other customers, and LocalBlox's unpaid sales tax. D.E. 384 at pp. 13:17-14:11, 19:21-20:7, 25:18-23. It was critical that each of these allegations occur before the Purchase Date. D.E. 384 at p. 24:16-19. Therefore, Onemata needed to establish that the sales tax issue was part of its lawsuit and that Rahman caused LocalBlox to provide X-Mode data to Prohibited Customers and misuse customer servers on or before December 18, 2019. Onemata's failure to establish the dates these matters occurred prohibited a

41

reasonable jury from imposing liability thereon, accepting Seigneur's Valuation, and awarding $5 million in contract damages. *Iden,* 609 So. 2d at 57 ("[T]here were simply no foundation facts upon which [the] expert opinion could be based. Consequently, there is no reason to consider that testimony.").

Onemata will likely try arguing that Seigneur's Valuation was based on various financial factors, market conditions, and other economic analytics in an effort to bolster the Valuation. For example, Onemata may argue that Seigneur premised his opinions on information obtained from management, LocalBlox's financial statements, the Purchase Agreement, the pleadings, projections, national economic conditions, industry factors, and comparable companies. D.E. 413 at p. 10. These likely arguments are a distraction because they do not relate to the substantive claims Onemata asserted against Rahman. *Am. Transp., Inc. v. Richard Sewing Mach. Co.,* 172 F.3d 781, 784 (11th Cir. 1999) ("A party cannot recover damages for breach of contract unless it can prove that the damages were proximately caused by the breach."). Although Seigneur may have analyzed these factors to formulate his Valuation, they do not allow a reasonable jury to impose damages of $5 million because they have no relation to Rahman's alleged contractual breaches. *See Underwriters at Interest v. All Logistics Group, Inc.,* 483 F. Supp. 3d 1199, 1205 (S.D. Fla. 2020), *appeal dismissed,* 2021 WL 2190226 (11th Cir. Mar. 4, 2021) (granting summary judgment because the "plaintiff has not met

its burden establishing what, if any, damages flowed from the breach."). Onemata had to prove Seigneur's Valuation related to Rahman's conduct. *Messer v. E.F. Hutton & Co.,* 833 F.2d 909, 923 (11th Cir. 1987), amended on reh'g in part, 847 F.2d 673 (11th Cir. 1988) ("The problem with [the plaintiff]'s proof of damages, however, is not the *measurement* of damages but their *causation.* Unless a plaintiff can show with reasonable certainty that the defendant's wrongful conduct proximately *caused* damages, questions of measurement never arise.*"*). Onemata's inability to establish this (combined with its inability to prove the Valuation was based on breaches that occurred before the Purchase Date) preludes a reasonable jury from imposing damages on Rahman of $5 million.

If it is assumed that Seigneur did not include the sales tax issue and X-Mode issues into his Valuation, than Seigneur's Valuation is limited to the customer server misuse issue. Seigneur cannot rely on this breach as sole cause for his Valuation because Onemata failed to present evidence demonstrating Rahman breached the Purchase Agreement by causing LocalBlox to misuse its customers' servers before the Purchase Date. *See supra* at pp. 36-41. Therefore, Seigneur's reliance on this single breach to form the basis of his Valuation cannot enable a reasonable jury to return a $5 million verdict in favor of Onemata.

**5.    The jury could not rely on evidence outside Seigneur's Valuation to determine damages.**

Onemata bore the burden of proving its standing to recover certain damages relating to ACTON, Embark Consulting, Amazon Web Services, and Arefin's withdrawal of cash from LocalBlox's bank account. *See Bischoff v. Osceola County, Fla.,* 222 F.3d 874, 878 (11th Cir. 2000) ("The party invoking federal jurisdiction bears the burden of proving standing."). Onemata can only satisfy its burden by proving it had a "personal stake in the outcome of the controversy as to warrant [its] invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on [its] behalf." *Warth v. Seldin*, 422 U.S. 490, 498–99 (1975) (internal quotations and citations omitted). Therefore, Onemata needed to establish it sustained an injury "that is likely to be redressed by a favorable decision." *Simon v. E. Kentucky Welfare Rights Org.*, 426 U.S. 26, 38 (1976).

Onemata failed to prove it sustained an injury with regard to ACTON, Embark Consulting, Amazon Web Services, and Arefin's withdrawal of cash from LocalBlox's bank account because the evidence showed each liability was owed or owned by LocalBlox. LocalBlox owed ACTON $80,000, Embark consulting $15,000, and Amazon $307,215.88. D.E. 373-9; D.E. 373-11; D.E. 373-31. Arefin owes LocalBlox $255,000. D.E. 380 at pp. 68:16-69:20. Onemata never provided evidence demonstrating how or why it had standing to recover these damages directly. Onemata could not make the requisite showing because it never merged

with LocalBlox. D.E. 381 at p. 15:3-14. Onemata was merely a LocalBlox shareholder. *Id*. Onemata's shareholder status does not provide it sufficient interest to recover damages that should flow directly to/from LocalBlox. *See* S*abey v. Howard Johnson & Co.,* 5 P.3d 730, 735 (Wash. Ct. App. 2000) ("A shareholder cannot sue for wrongs done to a corporation, because the corporation is a separate entity: the shareholder's interest is viewed as too removed to meet the standing requirements."); *Id*. ("Even a shareholder who owns all or most of the stock, but who suffers damages only indirectly as a shareholder, cannot sue as an individual.").[3]

Concealing the ACTON settlement agreement, Embark Consulting invoice, Amazon Web Services invoice, and Arefin's bank withdrawal from Onemata is not determinative on whether Onemata can recover damages for amounts owed directly to LocalBlox. *See* D.E. 373-9; D.E. 373-11; D.E. 373-31. Onemata arguably presented evidence at trial indicating Rahman breached the Purchase Agreement by concealing the aforementioned issues. D.E. 380 at pp. 68:16-69:20, 166:20-23, 176:7-19, 199:20-23. These purported concealments do not enable Onemata to

---

[3] Washington law applies to this analysis because LocalBlox is incorporated in Washington and Florida's internal affairs doctrine dictates that "'the extent and nature of [the] relationship between corporation and stockholder, corporate officer or director and stockholder[,] and ... stockholders inter sese' should be governed by the laws of the state of incorporation." *Freedman v. magicJack Vocaltec Ltd.,* 963 F.3d 1125, 1133 (11th Cir. 2020) (bracketed text included and parallel citations omitted); *see also* D.E. 373-4 at p. 1 (LocalBlox is a Washington Corporation)

recover the amounts LocalBlox owes or is owed because Onemata is not the obligated party. For example, Onemata was never obligated to pay ACTON $80,000 under the settlement agreement between LocalBlox and ACTON, Embark consulting $15,000 under the Embark consulting invoice, or Amazon $307,215.88 under the Amazon invoices. *See* D.E. 373-9 at p. 1; D.E. 373-11; D.E. 373-31.

Onemata had to prove Rahman's concealment of the ACTON issue, Embark Consulting issue, Amazon Web Services issue, and Arefin's withdrawal altered the purchase price of LocalBlox under the Purchase Agreement. Onemata's only ability to advance this evidence would have been through Seigneur. However, Seigneur did not base his valuation on the issues above because Seigneur's analysis was limited to the X-Mode issue, customer server issue, and unpaid tax issue. D.E. 384 at pp. 13:17-14:11, 19:21-20:7, 25:18-23. In addition, the verdict form precludes this Court from parsing the basis for the jury's verdict because the district court permitted the use of a general verdict form over Rahman's objection. *See* D.E. 387 at pp. 22:9-20, 137:23-138:10.

**6.    The district court abused its discretion by allowing the jury to use a general verdict form.**

Rahman advocated for a special verdict form requiring the jury to identify each individual breach Rahman and Arefin committed. *See* D.E. 358-1 at pp. 1-3. Rahman sought this verdict form to prevent post-trial guesswork requiring the parties and the Court to speculate about which actions gave rise to which breaches.

46

Alleviating such guesswork was especially important in this case given its lengthy and complicated fact pattern. *See* D.E. 73 at pp. 5-22. Therefore, Rahman requested that each potential breach be separated out and objected when a special verdict form was not used. D.E. 387 at pp. 22:15-20, 137:23-138:10. However, the district court rejected Rahman's request. This rejection was an abuse of discretion because the parties cannot know which portion of the $5 million verdict was attributable to which underlying breach and which breach was attributable to Rahman or Arefin.

As an example, the parties do not know which damages flowed directly from the X-Mode Issue, Customer Server Issue, or any other contract issue in the case. This wreaked havoc on the ultimate verdict because Rahman's Note counterclaims were tethered to the X-Mode Issue and Customer Server Issue. The X-Mode Issue and Customer Server Issue occupied the majority of trial evidence; therefore, it likely influenced the jury the most. However, the evidence demonstrated Rahman did not breach the Purchase Agreement on or before the Purchase Date with respect to the X-Mode Issue and Customer Server Issue. *See supra* at pp. 31-41. Therefore, the jury could not have imposed liability against Rahman on this issue or alleviated Onemata of its obligation to pay Rahman under his Notes because those results likely flow from the X-Mode Issue and Customer Server Issue. This error was harmful. A new trial should therefore be granted on all contract issues, including Rahman's counterclaims for unpaid Notes.

47

**C.    The verdict amount should be remitted to $657,215.88.**

A court may grant a new trial for any reason new trials are generally granted. *See* Fed. R. Civ. P. 59 ("The court may . . . grant a new trial . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court."). An excessive verdict is one reason to grant a new trial because it protects against manifest injustice. *See Johansen v. Combustion Eng'g, Inc.,* 170 F.3d 1320, 1328 (11th Cir. 1999) ("A court which believes the jury's verdict is excessive may order a new trial unless the plaintiff agrees to remit a portion of the jury's award."); *Hewitt v. B.F. Goodrich Co.,* 732 F.2d 1554, 1559 (11th Cir. 1984) ("The trial judge must protect against manifest injustice in the jury's verdict."). State substantive law provides the rubric for determining whether a verdict is excessive in diversity cases, while federal law provides the rubric for determining whether any excess warrants a new trial. *Quality Foods, Inc. v. U.S. Fire Ins. Co.*, 715 F.2d 539, 542 (11th Cir. 1983) ("The determination of whether a jury verdict is excessive in a diversity case is left to the state substantive law. However, the federal law will determine whether a new trial should be granted due to a jury verdict of excessive damage.").

Florida statutory law provides five factors for analyzing a verdict's excessiveness. *See* Fla. Stat. § 768.74 (5)(a)-(e). They include: (a) whether the trier of fact ignored evidence or misconceived the merits of the case relating to damages;

(b) whether the trier of fact took improper elements of damages into account or speculated about damages; (c) whether verdict is reasonably related to the amount of damages proved; and (d) whether the amount is supported by the evidence and could be adduced in a logical manner by reasonable persons. *Id.*

A new trial will be granted based on the factors above when the maximum recovery rule is violated. *See Keyes v. Lauga,* 635 F.2d 330 (5th Cir. 1981). This rule prevents a jury's verdict from exceeding the maximum amount that could have been properly awarded based on the trial evidence. *Id.* ("Our review of this issue is limited to an examination of whether the damage award is beyond the maximum possible award supported by the evidence in the record."); *Lowe v. General Motors Corp.,* 624 F.2d 1373, 1383 (5th Cir. 1980) ("In determining the appropriate remittiturs, the district court must heed to the maximum recovery rule", which "requires the Court to determine the maximum amount of deviation from that verdict that could be allowed without requiring a new trial."); *Gorsalitz v. Olin Mathieson Chemical Corp.,* 429 F.2d 1033, 1047 (5th Cir. 1970), *cert. denied,* 407 U.S. 921 (1972) (For purposes of determining the amount of remittitur, the proper test of excessiveness is "the maximum which the jury could reasonably find.").

The Court should grant a new trial, amend the judgment, or remit the verdict because $657,215.88 is the maximum verdict amount permitted by the trial evidence. As argued above, the jury's reliance on Seigneur's Valuation to determine damages

was improper because Seigneur's Valuation was not based on trial evidence. *See supra* at pp. 31-42. The only remaining damages evidence was 80,000 for the ACTON liability, $15,000 for the Embark Consulting liability, $307,215.88 for the Amazon liability, and $255,000 for the funds Arefin withdrew from LocalBlox's account (assuming Onemata had standing to recover these damages). D.E. 373-9; D.E. 373-11; D.E. 373-31; D.E. 380 at pp. 68:16-69:20, 166:20-23, 176:7-19, 199:20-23. Therefore, the maximum amount the jury could award was $657,215.88 [$80,000 + $15,000 + $307,215.88 + $255,000 = $657,215.88]. The jury's $5 million award exceeds the maximum damages amount by about seven and a half times. Therefore, the jury ignored the evidence, took improper elements of damages into account, arrived at the verdict amount by speculation, awarded damages that do not bear reasonable relation to the amount of damages proved at trial, and cannot be adduced by a logical manner by reasonable persons. The issue is compounded because the district court required the use of a general verdict form that combined all contractual breach issues into a single interrogatory. *See* D.E. 387 at pp. 22:9-20, 137:23-138:10.

**D.**    **The $5 million verdict should alternatively be remitted to $2,235,093 at most.**

The jury's verdict should be remitted because it exceeds the total value of the Purchase Agreement and the maximum damages amount permitted by the evidence and law. The prevailing party in a breach of contract case is limited to recovering damages placing it in as good a position had the contract been performed. *See Air Caledonie Intern. v. AAR Parts Trading, Inc.,* 315 F. Supp. 2d 1319, 1337 (S.D. Fla. 2004) ("The underlying purpose of breach of contract damages is to place the non-breaching party in the same position it would have been in but for the breach."); *Allapattah Services, Inc. v. Exxon Corp.,* 61 F. Supp. 2d 1326, 1328 (S.D. Fla. 1999) ("The underlying purpose of damages in actions premised on a breach of contract is to place the non-breaching party in the same position it would have occupied if the contract had not been breached."). As demonstrated below, Onemata's breach of contract award exceeds this amount by more than double [$5,000,000 - $2,235,093 = $2,764,907].

Onemata paid Rahman and Arefin a total of $4,573,093 for LocalBlox in cash and stock [$2 million in cash + $2,573,093 in equity = $4,573,093]. D.E. 373-2 at p. 1; D.E. 380 at pp. 62:9-63:5, 86:17-87:9, 91:18-20; D.E. 382 at p. 94:8-11.[4]

---

[4] The undisputed trial evidence demonstrates Onemata never paid Rahman or Arefin any amount under the Notes despite Rahman's payment demands and Onemata's current ownership of LocalBlox. D.E. 380 at pp. 247:16:22; D.E. 386:151:12-152:2.

However, Seigneur opined that LocalBlox's actual value on the Purchase Date was $2,338,000. D.E. 384 at p. 18:11-14. Therefore, Onemata overpaid Rahman and Arefin by $2,235,093 [$4,573,093 - $2,338,000 = $2,235,093]. This is the maximum amount Rahman could have damaged Onemata because an award of more than $2,235,093 places Onemata in a better position that it would have been had the Purchase Agreement been performed by Rahman. Therefore, the district court abused its discretion in refusing to remit the jury's $5 million verdict to $2,235,093 because Onemata received a windfall recovery.

The jury's determination that Rahman and Arefin could not recover the value of their Notes exacerbated the excessive verdict because Onemata received the benefit of LocalBlox without paying any consideration for the asset. *See* D.E. 364 at p. 2-4 (determining that Onemata was not liable for breach of the Notes). The jury's $5 million breach of contract award allowed Onemata to recover all sums paid to Rahman and Arefin during the course of performance plus an extra $426,907 [$5,000,000 verdict – ($2 million in cash paid to Rahman and Arefin + $2,573,093 in equity paid to Rahman and Arefin) = $426,907]. This portion of the jury's verdict alone more than fully compensates Onemata for the contractual breaches because Onemata recovered more than double the value of LocalBlox. *See* D.E. 384 at p. 18:11-14 (opining that the value of LocalBlox on the Purchase Date was $2,338,000).

The jury's additional determination that Onemata was alleviated from the obligation of paying Rahman and Arefin $2,994,826 required under the Notes and Purchase Agreement had the effect of increasing Onemata's contract damage award to $7,994,826 [$5,000,000 + $2,994,826 = $7,994,826]. This result is illogical, absurd, excessive, and amounts to a windfall recovery for Onemata because Onemata gained a business generating millions in annual revenues, but does not have to pay anything for that business, and the business's seller (Rahman) must pay the purchaser (Onemata) $5 million. Therefore, a new trial should be granted and Rahman should be entitled to retry the issue of Onemata breaching this Notes during that trial.

**E.    The district court abused its discretion in disallowing Dr. Cole to present his entire rebuttal opinion.**

A rebuttal expert "may state new alternatives or use new testing…, so long as it 'broadly relates to the 'same subject matter' as the expert's report.'" *Ohio State Troopers Ass'n, Inc. v. Point Blank Enterprises, Inc.,* 2020 WL 1666763, at *9 (S.D. Fla. Apr. 3, 2020); *see also* Fed. R. Civ. P. 26 (a)(2)(D)(ii). The phrase "same subject matter" is construed broadly. *Burger King Corp. v. Berry,* 2019 WL 571483, at *2 (S.D. Fla. Jan. 8, 2019) (and cases cited therein). Rebuttal experts may therefore "cite new evidence and data so long as the new evidence and data is offered to directly contradict or rebut the opposing party's expert." *Point Blank Enters.,* 2020 WL 1666763, at *9; *Papasan v. Dometic Corp.,* 2019 WL 7376716, at *3 (S.D. Fla. Apr. 10, 2019) ("A proposed rebuttal expert satisfies this standard as long as the information provided by the rebuttal expert repels the affirmative expert testimony of the other party.").

**1.    Dr. Cole analyzed LocalBlox Production Code to disprove O'Day's opinions regarding LocalBlox's use of TrueInfluence's API key.**

Dr. Cole initially analyzed the same code O'Day analyzed and determined LocalBlox could not have used that code to transfer data to customers because it lacked certain foundational elements that precluded it from functioning. D.E. 270-1 at pp. 36:23-37:7, 40:21-41:2, 73:11-15, 73:21-24; D.E. 171-4 at ¶¶ 28-30, 33-34. As a result, Dr. Cole reviewed the Production Code to ensure his findings were

accurate and further contest O'Da's Opinions. D.E. 270-1 at pp. 38:22-39:10. This analysis allowed Dr. Cole to conclude that LocalBlox used customer dependent code variants to deliver data. D.E. 171-4 at ¶¶ 35, 40. Dr. Cole's finding was critical because it directly contradicts O'Day's conclusions that the TrueInfluence API key was hardcoded into LocalBlox's code. *See* D.E. 384 at p. 119:3-14. Dr. Cole concluded that O'Day's findings were false because LocalBlox only used TrueInfluence's API Key when delivering data to TrueInfluence. D.E. 171-4 at ¶ 39 (a)-(c), at pp. 8-9; D.E. 217-2 at ¶ 35. LocalBlox used a customer specific variant of its Production Code to deliver data to non-TrueInfluence customers that did not contain TrueInfluence's API Key. *Id*.

## 2.    Dr. Cole analyzed the Production Code to disprove O'Day's opinions regarding LocalBlox's purported manipulation of X-Mode data.

Dr. Cole initially studied the same code O'Day analyzed on the X-Mode Issue. *See* D.E. 217-4 at ¶¶ 58-64. Dr. Cole again concluded O'Day's opinions must be false because they are based on code LocalBlox never actually used in conjunction with X-Mode data. D.E. 171-4 at ¶¶ 64, 66, 68, 74, 87. The code LocalBlox actually used with X-Mode data contained processes O-Day did not consider that made the X-Mode data more accurate. D.E. 171-4 at ¶¶ 66, 74-77, 78-81, 83-99. Dr. Cole's conclusions were important because they directly contradicted O'Day's opinion that Rahman manipulated X-Mode data to obfuscate its provision to Prohibited Customers. *See* D.E. 384 at pp. 130:21-133:2.

**3.    Excluding Dr. Cole's full rebuttal opinion was an abuse of discretion, substantially affected Rahman's rights, and was harmful error.**

The district court abused its discretion by prohibiting Dr. Cole from providing his full rebuttal opinion to the jury because the district court never considered the proper legal standard. *See United States v. Brown*, 415 F.3d 1257, 1266 (11th Cir. 2005) ("An abuse of discretion can occur where the district court applies the wrong law, follows the wrong procedure, bases its decision on clearly erroneous facts, or commits a clear error in judgment."). The district court prohibited Dr. Cole from providing his full rebuttal opinion once it learned Rahman provided the Production Code to Dr. Cole. D.E. 385 at pp. 21:15-23, 22:3-13. This ruling was made before Rahman finished his explanation and without considering whether Dr. Cole's rebuttal opinions regarding the Production Code broadly related to the same subject matter as O'Day's opinions. *Id.* The district court's failure to consider the relation of Dr. Cole's analysis of the Production Code to O'Day's original opinion and subsequent ruling was an abuse of discretion because the court applied an incorrect analysis foreclosing Rahman's opportunity to fully contest O'Day's opinions. Rahman demonstrated pre-trial and during trial that Dr. Cole's Production Code analysis broadly (and specifically) related to the same subject matter as O'Day's original opinions.

The exclusion of Dr. Cole's full rebuttal opinion was harmful error because the jury rendered a verdict against Rahman without the benefit of all relevant

evidence. The jury never knew a different set of code (1) delivered data to customers without the API Key (rather than hardcoded in the code) and (2) altered X-Mode data in a manner that made it more accurate (rather than for concealment purposes). *See supra* at pp. 54-57. Dr. Cole's explanation on the issues was paramount to neutralizing the negative impressions O'Day created, thus enabling the jury to arrive at a verdict for Rahman (especially in light of the general verdict form). The district court's preclusion of Dr. Cole's full rebuttal opinion was therefore harmful error.

**CONCLUSION**

Rahman respectfully requests that this Court overturn the District Court's Order Denying Defendants' JMOL and enter judgment in favor of Rahman. Rahman alternatively requests that he be granted a new trial on all issues of liability and damages including the Notes and that Dr. Cole be permitted to testify about all rebuttal opinions during that trial. Rahman also alternatively requests that this Court remit the verdict to $657,215.88 or $2,235,093.

Respectfully submitted,


**MAVRICK LAW FIRM**
1620 West Oakland Park Boulevard,
Suite 300
Fort Lauderdale, Florida 33311
(954) 564-2246
*Attorneys for Appellant*
*Ashfaq Rahman*

By:    */s/ Peter T. Mavrick*
Peter T. Mavrick
Florida Bar No.: 0083739
Jacob M. Resnick
Florida Bar No.: 85314

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts exempted, this document contains 12,891 words (no more than 13,000 words).

This document complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

This document compiles with the paper sizes, line spacing, and margin requirements of Federal Rule of Appellate Procedure 32(4) because this document is on an 8 ½ by 11-inch paper, the text is double-spaced, and the margins are one inch on all four sides.

By:    */s/ Peter T. Mavrick*
         Peter T. Mavrick

60

**CERTIFICATE OF SERVICE**

I hereby certify that on May 12, 2023, I served a copy of the foregoing upon counsel for Onemata Corporation, William Smith, and Enscicon Acquisitions II, LLC, and Sabira Arefin by filing the foregoing document via the Court's CM/ECF system. As a result, the foregoing document was electronically transmitted to Anthony Leffert, Kenneth Minerly, and Harry Winderman. I also certify that four copies of the foregoing document were contemporaneously mailed to the Clerk of Court, United States Court of Appeals for the Eleventh Circuit at 56 Forsyth Street N.W. Atlanta GA, 30303 pursuant to Eleventh Circuit Local Rule 31-3.

By:    */s/ Peter T. Mavrick*
          Peter T. Mavrick